IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA      )
                              )
            Plaintiff,        )
                              )
                              )
        v.                    )    Case No. 1:09CR0222
                              )
                              )    JUDGE OLIVER
LEE MICHAEL LUCAS             )
                              )
            Defendant.        )


            Response to Defendant's Pretrial
            Motions


            Bruce J. Teitelbaum
            Special Attorney to the
            Attorney General

            Michael A. Comber
            Special Attorney to the
            Attorney General

# TABLE OF CONTENTS

I.   BRIEF WRITTEN STATEMENT PURSUANT TO LOCAL RULE OF CRIMINAL
     PROCEDURE 12.1 . . . . . . . . . . . . . . . . . . . . . . i

II.  EVIDENCE INEXTRICABLY LINKED TO THE GOVERNMENT'S PROOF OF
     CHARGED CONDUCT. . . . . . . . . . . . . . . . . . . . . . 3

     A. DEFENDANT FAILS TO PLACE INDICTMENT LANGUAGE IN PROPER
        CONTEXT. . . . . . . . . . . . . . . . . . . . . . . . 3
     B. DEFENDANT DID NOT CONSPIRE WITH BRAY TO FRAME
        INNOCENT PEOPLE. . . . . . . . . . . . . . . . . . . . 5
     C. THE PARAGRAPHS DEFENDING UNCHARGED CONDUCT DESCRIBE
        ADMISSIBLE ACTS ESSENTIAL TO THE JURY'S CONSIDERATION.. 8
     D. THE LAW SUPPORTS INCLUSION OF PROPERLY ADMISSIBLE,
        INTRINSIC EVIDENCE. . . . . . . . . . . . . . . . . . 10

IV.  LIMITED PRETRIAL PUBLICITY DOES NOT WARRANT A CHANGE OF
     VICINAGE.. . . . . . . . . . . . . . . . . . . . . . . . 17

V.   THE GOVERNMENT HAS PROVIDED MORE PARTICULARS THAN THAT TO
     WHICH DEFENDANT IS LEGALLY ENTITLED. . . . . . . . . . . 19

     A. ADDITIONAL PARTICULARS PROVIDED BY LETTER OF
        SEPTEMBER 2, 2009 AND IN INSTANT RESPONSE.. . . . . . 19
     B. THE INFORMATION PROVIDED BY THE GOVERNMENT EXCEEDS
        THAT REQUIRED BY THE LAW. . . . . . . . . . . . . . . 26

VI.  DEFENDANT WAIVED ANY PRIVILEGE ASSOCIATED WITH THE
     DISSEMINATED MEMORANDA.. . . . . . . . . . . . . . . . . 30

VII. GOVERNMENT HAS PROVIDED TIMELY NOTICE OF 404(b) EVIDENCE
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

     A. Evidence offered, inter alia, Pursuant to Federal Rules
        of Evidence 404(b). . . . . . . . . . . . . . . . . . 35
     B. THE LAW SUPPORTS THE SUFFICIENCY OF THE GOVERNMENT'S
        NOTICE UNDER RULE 404(b) AND THE ADMISSIBILITY OF THE
        NOTICES EVIDENCE. . . . . . . . . . . . . . . . . . . 41

VIII.   F.R.EVID. 608(b) AND THE DOCTRINE OF JUDICIAL ESTOPPEL
        PERMIT CROSS-EXAMINATION ON DEFENDANT'S PRIOR
        MISCONDUCT
        . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
     A. RULE 608(b) PERMITS CROSS-EXAMINATION ON DEFENDANT'S
        PROPENSITY FOR UNTRUTHFULNESS AS EVIDENCED IN NOVATON
        . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
     B. THE COURT SHOULD NOT EXERCISE ITS DISCRETION TO APPLY THE
        DOCTRINE OF JUDICIAL ESTOPPEL.. . . . . . . . . . . . 47

## TABLE OF AUTHORITIES

Allen v. Zurich Ins. Co., 667 F.2d 1162 (4th Cir. 1982) . . . . 48

American Tobacco Co. v. United States, 147 F.2d 93 (6th Cir. 1945) 29

Anwar v. United States, 648 F.Supp 820 (N.D. N.Y 1986). . . . . 44

Benes v. United States, 276 F.2d 99 (6th Cir. 1960).. . . . . . 28

Conforti v. United States, 74 F.3d 838 (8th Cir. 1996) . . . . . 49

DeLisle v. Rivers, 161 F.3d 370(6th Cir. 1998). . . . . . . . . 18

Edwards v. Aetna Life Ins. Co., 690 F.2d 595 (6th Cir. 1982). . 48

Foley v. Parker, 488 F.3d 377 (6th Cir. 2007).. . . . . . . . . 17

Haines v. Liggett Group Inc., 975 F.2d 81(3d Cir. 1992).. . . . 31

Harley, 228 F.3d at 748.. . . . . . . . . . . . . . . . . . . . 15

Harris v. Stovall, 212 F.3d 940 (6th Cir. 2000). . . . . . . . . 17

Hickman v. United States, 406 F.2d 414 (5th Cir. 1969). . . . . 27

Huppert, 917 F.2d at 512. . . . . . . . . . . . . . . . . . . . 13

Irvin v. Dowd, 366 U.S. 717 (1961). . . . . . . . . . . . . . . 18

Libbey Glass, Inc. v. Oneida, Ltd., 197 F.R.D. 342, (N.D. Ohio
1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Murphy v. Florida, 421 U.S. 794 (1975) . . . . . . . . . . . . 18

Nevers v. Killinger, 169 F.3d 352 (6th Cir. 1999).. . . . . . 17, 18

New Hampshire v. Maine, 532 U.S. 742 (2001).. . . . . . . . 48, 58

Reynolds v. Comm'r of Internal Revenue, 861 F.2d 469(6th Cir. 1988)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Schachar v. Am. Acad. of Ophthalmology, Inc., 106 F.R.D. 187 (N.D.
Ill. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Teledyne Industries Incorporated v. Nat'l Labor Relations Bd., 911
F.2d 1214 (6th Cir. 1990). . . . . . . . . . . . . . . . . . . 48

United States v. Angelus, 258 Fed. Appx. 840 (6th Cir. 2007).18, 19

United States v. Armocida, 515 F.2d 49(1975). . . . . . . . 28, 29

United States v. Bagaric, 706 F.2d 42 (2d Cir. 1983). . . . . . 46

United States v. Cantu, 557 F.2d 1173 (5th Cir. 1977). . . . . . 26

United States v. Bakke, 942 F.2d 977 (6th Cir. 1991). . . . . . 42

United States v. Barnes, 49 F.3d 1144 (6th Cir.  1995) . . . . . 42

United States v. Bay State Ambul. and Hosp. Rental Service, Inc, 874 F.2d 20(1st Cir. 1989). . . . . . . . . . . . . . . . . . 32

United States v. Birmley, 529 F.2d 103(6th Cir. 1976). . . . . . 27

United States v. Chalmers, 410 F.Supp 2.d 278 (S.D.NY 2006). . . 30

United States v. Colson, 662 F.2d 1389 (11th Cir. 1981). . . . . 28

United States v. Dabish, 708 F.2d 240 (6th Cir. 1983). . . . . . 41

United States vs. Davis, 183 F.3d 231 (3d Cir. 1999) . . . . . . 46

United States v. Deaton, 448 F.Supp. 532 (N.D. Ohio 1978). . . . 28

United States v. DePalma, 461 F.Supp. 778(SDNY 1978) . . . . . . 11

United States v. Dreitzler, 577 F.2d 539 (9th Cir. 1978). . . . 28

United States v. Edwards, 72 F.Supp.2d 664 (M.D. La. 1999). . . 11

United States v. Finegan, 189 F.Supp. 728(N.D. Ohio 1960). . . . 29

United States v. Fischbach & Moore, Inc., 576 F.Supp. 1384 (W.D. Pa. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Fischbach and Moore, Inc., supra, 576 F.Supp. at 1388 . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Ford, 812 F. Supp. 761 (W.D. Tenn. 1991). . 18, 19

United States v. Gabriel, 715 F.2d 1447(10th Cir. 1983). . . . . 29

United States v. Gavina-Pena,(1:02CR449 N.D. of Ohio, Judge Economus) . . . . . . . . . . . . . . . . . . . . . . . . . . 43

United States v. Geneva France, et al.. . . . . . . . . . . . 40

iv

United States v. Germain, 411 F.Supp. 719 (S.D. Ohio 1975). . . 28

United States v. Giese, 597 F.2d 1170 (9th Cir. 1979). . . . 26, 27

United States v. Goldman, 439 F.Supp. 337 (S.D. N.Y. 1977). . . 30

United States v. Gotti, 771 F. Supp. 535 (E.D. N.Y. 1991). . . . 32

United States v. Grap, 368 F.3d 824 (8th Cir. 2004). . . . . . 58

United States v. Hamilton, 684 F.2d 380 (6th Cir.). . . . . . . 41

United States v. Hardy, 228 F.3d 745 (6th Cir. 2000). . . . 14, 15

United States v. Haskins, 345 F.2d 111 (6th Cir. 1965).
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Hedgepeth, 434 F.3d 609(3d Cir. 2006). . . . . 11

United States v. Hill, 589 F.2d 1344. . . . . . . . . . . . . . 26

United States v. Hill, 589 F.2d 1344(8th Cir. 1979). . . . . . 26

United States v. Hsia, 81 F. Supp. 2d 7(D.D.C. 2000) . . . . . 31

United States v. Huppert, 917 F.2d 507 (11th Cir. 1990). . . . . 12

United States v. Isaacs, 364 F.Supp. 895(N.D. Ill. 1973). . . . 28

United States v. Jackson, 882 F.2d 1444(9th Cir. 1989) . . . . . 45

United States v. Joseph, 510 F.Supp. 1001(E.D. Pa. 1981). . . . 28

United States v. Kemper, 503 F.2d 327 (6th Cir. 1974). . . . . . 11

United States v. Kendall, 665 F.2d 126 (7th Cir. 1981). . . . . 29

United States v. Key, 717 F.2d 1206 (8th Cir. 1983). . . . . . . 27

United States v. Kilroy, 523 F.Supp. 206 (E.D. Wis. 1981). . . . 29

United States v. Leonelli, 428 F.Supp. 880(S.D. N.Y. 1977). . . 28

United States v. Long, 706 F.2d 1044 (9th Cir. 1983). . . . . . 29

United States v. Mannino, 480 F.Supp. 1182 (S.D. N.Y. 1979). . . 30

United States v. Marks, 364 F.Supp. 1022 (S.D. N.Y. 1973). . . . 28

United States v. Matlock, 675 F.2d 981 (8th Cir. 1982). . . . . 28

United States v. McCaskey, 9 F.3d 368 (5th Cir. 1993) . . . . . 58

United States v. McPartlin, 595 F.2d 1321 (7th Cir. 1979) . . . 31

United States v. Merriweather, 78 F.3d 1070 (6th Cir. 1996).. . 42

United States v. Moss, 9 F.3d 543 (6th Cir. 1993).. . . . . 11, 31

United States v. Norton, 867 F.2d 1354 (11th Cir. 1989).. . . . 13

United States v. Novaton, 271 F.3d 968 (11th Cir. 2001). 43-45, 47, 58, 59

United States v. Owens, 54 F.3d 271 (6th Cir. 1995) . . . . . . 49

United States v. Passarella, 788 F.2d 377 (6th Cir. 1986).. . . 41

United States v. Perez, 489 F.2d 51(5th Cir. 1973). . . . . 27, 30

United States v. Roberts, 548 F.2d 665(6th Cir. 1977).. . . . . 14

United States v. Rosenfeld, 264 F.Supp. 760(E.D. Ill. 1967).. . 30

United States v. Sanders, 462 F.2d 122 (6th Cir. 1972). . . . . 28

United States v. Shoher, 555 F.Supp. 346 (S.D. N.Y. 1983).. . . 28

United States v. Smith, 692 F.2d 693 (10th Cir. 1982).. . . . . 26

United States v. Terry, 702 F.2d 299 (2d Cir. 1983) . . . . . . 46

United States v. Thomas, 875 F.2d 559(6th Cir. 1989). . . . . . 11

United States v. Watt, 911 F.Supp. 538 (D. D.C. 1995).. . . . . 13

United States v. Weinstock, 153 F.3d 272 (6th Cir. 1998). . . . 13

United States v. Whitmore, 359 F.3d 609 (D.C. Cir. 2004). . . . 45

United States v. Weissman, 195 F.3d 96 (2d Cir. 1999).. . . . . 34

United States v. Williford, 764 F.2d 1493(11th Cir. 1985).. 12, 48

Wardius v. Oregon, 412 U.S. 470 (1973). . . . . . . . . . . . . 27

Will v. United States, 389 U.S. 90 (1967).. . . . . . . . . . . 27

Wong Tai v. United States, 273 U.S. 77 (1927).. . . . . 26, 27, 29

Zedner v. United States: 547 U.S. 489 (2006). . . . . . . . 27, 48

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 1:09CR0222 |
| | ) | |
| | ) | JUDGE OLIVER |
| LEE MICHAEL LUCAS | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S RESPONSE TO DEFENDANT'S PRETRIAL MOTIONS

AND NOW comes the United States of America, by Bruce J. Teitelbaum and Michael A. Comber, Special Attorneys to the Attorney General, and hereby responds to defendant's pretrial motions.

I.    BRIEF WRITTEN STATEMENT PURSUANT TO LOCAL RULE OF CRIMINAL PROCEDURE 12.1

On May 12, 2009, a Grand Jury in the Northern District of Ohio returned an 18 count indictment which charges the defendant, Lee M. Lucas, a Special Agent of the Drug Enforcement Administration, with seven counts of obstruction of justice (Counts 1-7), one count of making a false statement (Count 8), seven counts of perjury (Counts 9-15) and three counts of violating civil rights (Counts 16-18).

All of the charges relate to a narcotics investigation headed by Defendant Lucas in the city of Mansfield, Richland County, Ohio, between August and November of 2005, and the two trials which resulted therefrom. During the investigation Defendant Lucas served as the control agent for a cooperating source, Jerrell Bray. The

operation entailed conducting 15 controlled purchases of cocaine and/or crack cocaine, involving 18 defendants. Unbeknownst to Defendant Lucas at the time, Bray deliberately staged false scenarios on 13 of the buys which resulted in false charges being brought by the United States Attorney's Office for the Northern District of Ohio against 17 of the 18 individuals. Seven of these individuals proceeded to trial, Geneva France in February 2006, and Lowestco Ballard, Dewayne Nabors, Joe Ward, Johnny Parker, Jason Westerfield and Danny Lee Brown in July 2006. A final defendant, Joshawa Webb's, case was severed and was still pending as of the dismissals of all charges against all defendants wherein Bray had been utilized as a cooperating source.

In May 2007, Bray shot an individual in Cleveland during an attempted drug transaction. While incarcerated for this offense Bray admitted to having framed the aforementioned individuals. Bray pleaded guilty to two counts of perjury and five civil rights violations before this Honorable Court in December 2007, and has been sentenced to 15 years incarceration.

The instant indictment alleges that Defendant Lucas manufactured inculpatory evidence, suppressed exculpatory evidence, and committed perjury in order to further and enhance the prosecutions of the individuals set up by his cooperating source, Jerrell Bray.

On September 15, 2009, Defendant Lucas filed an omnibus pretrial motion requesting the following relief:

1.   Strike a Portion of Indictment as Surplsage

2

2.    Change of Vicinage Due to Pretrial Publicity

3.    Bill of Particulars

4.    Bar Introduction of Certain Documents as Violative of the Work Product Doctrine

5.    Disclosure Pursuant to Rule 404(b)

6.    Bar Cross-Examination of Defendant Lucas on Specific Instances of Prior Misconduct

For the reasons set forth herein, the government objects to the requested relief and seeks an Order from this Court denying defendant's requests.[1]

II.    <u>EVIDENCE INEXTRICABLY LINKED TO THE GOVERNMENT'S PROOF OF CHARGED CONDUCT</u>

A. DEFENDANT FAILS TO PLACE INDICTMENT LANGUAGE IN PROPER CONTEXT

The Defendant contends that paragraph 8 should be stricken from the Indictment as surplusage and that all evidence relating to buys (paragraphs 8a, c, d, i, h) in which Defendant Lucas is not specifically charged with criminality should be held inadmissible at trial.  The government respectfully submits that paragraph 8, as a whole, including the averments relating to the non-charged buys, is not unduly prejudicial to the Defendant and sets forth material and relevant facts essential to the jury's ability to accurately and fairly assess the evidence as to the specific charged counts.

Paragraphs 1-12 of the Indictment set forth a factual narrative which frames in time and context the Defendant's charged

---

[1]The list of authorities required by Local Rules of Criminal Procedure 12.1 is found <u>infra.</u> at page iii.

criminal conduct. The relevant period covered is August 17, 2005, through May 16, 2007. This is the period during which Jerrell Bray served as a cooperating source for the Cleveland Field Office of the Drug Enforcement Administration (DEA) under the control of Defendant Lucas.

Contextually, the crimes charged relate to the Defendant's conduct in relation to a narcotics investigation in Mansfield, Ohio. The Defendant coordinated a series of 15 controlled drug purchases made by Bray, occasionally accompanied by the defendant or another officer, between September 6, 2005, and November 8, 2005. The investigation resulted in the arrests of 18 individuals and two trials: United States v. France in February 2006, and United States v. Nabors, et al. in July 2006.

Paragraph 8 of the Indictment, which the Defendant seeks to have stricken, sets forth in specificity and with brevity the manner by which Bray employed various ruses to dupe his law enforcement handlers into believing that he had made buys from targeted individuals on 13 of the 15 controlled purchases. Bray's motives were not complicated. Bray received substantial payments for purportedly making buys from individuals presumed by local authorities to be substantial drug traffickers. Initially, Bray, in fact, made purchases from his regular supplier and merely claimed to have purchased from the targets. Bray, seeing that his assertions went unchallenged, pocketed his informant fees without jeopardizing his real source.

4

Bray progressed into pretending to make buys from targeted subjects, who, in reality, either he did not have access to or they were not sufficiently large enough dealers to provide the desired weight - 50 grams of crack cocaine. On all but four of the buys, Bray provided his own crack by having an unwitting associate deliver it to him for re-sale to the DEA. Bray's ruses were never questioned. In fact, Defendant Lucas and others actually confirmed his misidentifications. Bray enhanced his profits and his standing by selling his own drugs to the DEA at inflated prices.

B. DEFENDANT DID NOT CONSPIRE WITH BRAY TO FRAME INNOCENT PEOPLE

Paragraphs 1-8 of the Indictment lay out the setting and contextual background wherein, what should have been a routine narcotics investigation and prosecution, went awry resulting in the wrongful indictments, trials, and in many cases, convictions of 17 individuals. Paragraphs 9-12 of the Indictment allege that Defendant Lucas manufactured inculpatory evidence, suppressed exculpatory evidence, and committed perjury, to further and enhance the prosecutions of the individuals setup by his cooperating source, Jerrell Bray.

The government does not allege that the Defendant conspired with Bray to set up innocent persons. The government does not contend that Defendant Lucas was even aware of Bray's scheme. There is no conspiracy alleged between the Defendant Lucas and Bray. To the extent that the Defendant proposes in his motion that there is an alleged

5

conspiracy to set up innocent persons between Bray and CIs 1-7, he is wrong.

To the contrary, the government does intend to establish that CIs 1-7 believed that they were participating in normal drug transactions. Bray, recognizing the slovenliness of the investigation, the lack of control by Defendant Lucas over Bray's actions, and the apparent willingness of Defendant Lucas to simply confirm whatever Bray said occurred, embarked on an escalating course of framing for profit.

As Defendant points out in his brief, had this been all the government alleged, the Defendant's conduct may have been negligent, but not criminal.  However, the essence of the Indictment is that the Defendant, operating within the surreal world created by Bray, knowingly and intentionally manufactured inculpatory evidence, suppressed exculpatory evidence, and committed perjury in order to bolster the credibility of Bray and thus the strength of his case. Defendant Lucas, thereby enhanced the likelihood of convictions of those whom he presumed to be guilty.[2]

---

[2]The defendant writes in his motion that "although all of these 'victims' were undoubtedly drug traffickers with long records of drug violations and other violent crimes, needless to say, they should not have been framed by Bray on drug deals if they did not actually participate in them" and that, "those officials (the defendant and his co-agents) came away with nothing to show for their considerable efforts because of the government's dubious decision to dismiss all of these cases, including those where the drug defendants freely and voluntarily admitted their guilt under oath." (Brief pp. 13-14).

To the extent that either of these sentiments is relevant to the Court's decision, the government concurs with the principle that even individuals with lengthy criminal pasts deserve not to be framed.  We do feel compelled, however, to point out that all but

6

C. THE PARAGRAPHS DETAILING UNCHARGED CONDUCT DESCRIBE
ADMISSIBLE ACTS ESSENTIAL TO THE JURY'S CONSIDERATION

The Defendant points out that he is not charged with a specific criminal act related to five of the buys: Paragraphs 8(a) (Noel Mott 9/6), (c) (Joe Ward, Johnny Parker 9/13), (d) (Tyrone Brown 9/13), (i) (Johnny Robertson 10/11), and (l) (Nolan Lovett 10/27)). This list should also include the Robert Burton buys on 9/27 and 9/29 (para 8(g)). However, what is material, relevant and essential to the jury's understanding of what occurred regarding the Mansfield case is

_____

perhaps two of the victims here had marginal, if any, criminal record.  As of the time of their arrests, none of the victims had a record for violent offenses.

Regarding the decision to dismiss all of the federal cases (with the exception of one which did not result from the Bray/Lucas investigation), the government was faced with the situation wherein a number of persons were believed to be wrongfully incarcerated. They included Geneva France, single mother of three with no criminal record, serving a ten year sentence. All evidence, with the exception of a positive identification by Defendant Lucas, showed she had no involvement with the offense for which she was convicted.  Bray's recantation of her involvement was massively corroborated. As of the time of the dismissals, other recantations by Bray were being substantiated. Along with the identification of France from whom the Defendant Lucas purportedly made a hand-to-hand buy in a car, the government had substantial reason to believe - and later confirmed - that the defendant had also wrongfully identified Joshua Webb and Roosevelt Williams with whom he conducted hand-to-hand buys in cars and Duane Nabors, Lowestco Ballard, Frank Douglas, and Ronald Davis whom he had allegedly surveilled at close ranges. As for individuals who had pled guilty, it was determined that several individuals had, in fact, pled guilty to crimes they did not commit, in order to avoid much higher potential sentences from exposure to the conspiracy charge of which they were also innocent.  (In fact, the allegation of there having been a conspiracy among the Mansfield defendants was itself based upon groundless assertions made by the Defendant.)  Those who pled reasoned that their word would not be believed over that of Defendant Lucas, as had been demonstrated at the  France case. Each defendant was entitled to withdraw his guilty plea, based on new evidence (Bray) and the government was left without a readily provable case.  The decisions to dismiss were mandatory, not dubious.

the full story of Bray's developing role as an informant over the two month period from September 6 to November 8, 2005, and the defendant's reactions thereto.

Several of the first buys (para 8(a)(b)(e)) by Bray are directly related. The first on September 6th, involved Bray entering by himself into a residence to make a buy from C-1 whom he falsely identified as Noel Mott. (Para 8(a)) This buy was followed only 3 days later by the September 9th buy from Lowestco Ballard, wherein Bray dealt in the open with C-1, who he this time identified as being Lowestco Ballard. (para 8(b))  The defendant is charged at counts 9 and 10 with falsely testifying to having pulled along side of and identifying, "Ballard" at the conclusion of this deal.  On September 15, 2005, Bray made a second buy at the purported residence of Mott (actually the residence of C-1) and was allegedly caught stealing $780 of the buy money by the defendant and other officers. (para 8(e)). The Defendant allegedly concealed and suppressed this information (Count 2), the disclosure of which would have, at a minimum, mandated a high level review of Bray's status as an informant.

The buys designated in paragraphs  8(c) (Ward/Parker) and (d) (Tyron Brown), each occurred on September 13, 2005.  As to the Ward/Parker deal, the Defendant swore at trial that he had Bray under constant surveillance so that Bray could not have provided his own drugs to the buy. The government intends to establish that Bray did in fact meet with an associate who slipped him the drugs while en route to the Ward/Parker buy. The Tyron Brown buy is significant in

8

understanding the Defendant's alleged criminal actions regarding Danny Lee Brown (para 8(m) and Counts 7 and 15). In the Danny Lee Brown buy, the defendant is charged with falsely testifying to being able to identify the drug courier (who he also mis-identifies) as being the same courier used earlier by his brother, Tyron, thereby establishing a conspiratorial connection between the two brothers.

Bray's targeting of Burton, paragraph 8(g), stems directly from and is integral to understanding the alleged illegal actions against Dewayne Nabors (Counts 3, 11, 12 17). Burton was the actual supplier in the "Nabors" deal and provided the drugs Bray sold in the later deals.

Paragraphs 8(i) (Johny Robertson) and (l) (Nolan Lovett) each also involve inaccuracies by the Defendant - the intentionality of which will be the ultimate question for the jury. As to Robertson, the Defendant purports in his report that Robertson was observed receiving the buy money. In fact, Bray's associate, C-3, received all of the money from Bray. Robertson was an innocent dupe. The Lovett deal, wherein Bray asked Lovett to hold some drugs for him and then picked them up to establish the "buy", will help confirm Bray's assertions that he was not searched before or after the buys as the Defendant repeatedly asserted, in that Bray pocketed the DEA buy money at the deal. (See Defendant's brief, p.13).

Evidence as to each of the buys constitutes a thread to the complete story which will assist the jury in determining whether the Defendant deliberately lied, was simply mistaken, or was, in fact,

9

truthful and accurate in preparing and presenting his investigation. If it should be found that the Defendant, a federal law enforcement officer, lied by fabricating inculpatory evidence, suppressing exculpatory evidence, and committing perjury in order to gain convictions, his conduct would most certainly not  be viewed as "relatively benign or tame" as compared with Bray's. (Defendant's brief, p.20)

        D. <u>THE LAW SUPPORTS INCLUSION OF PROPERLY ADMISSIBLE, </u>
<u>INTRINSIC EVIDENCE</u>

        The Defendant correctly points out that Rule 7(d) of the Federal Rules of Criminal Procedure permits a court to strike surplusage.  The issue is left to the sound discretion of the district court.  However, the Sixth Circuit, as has every other circuit to have addressed the issue, has noted that Rule 7(d) "has been strongly construed against striking surplusage."  See <u>United States v. Kemper</u>, 503 F.2d 327, 331 (6th Cir. 1974).

        All circuits to have addressed the issue concur that language may be stricken only if the words are <u>both</u> irrelevant and unduly prejudicial.  See <u>United States v. Hedgepeth</u>, 434 F.3d 609, 512 (3d Cir. 2006), citing references to the Second, Fourth, Fifth, Eighth and D.C. Circuits.  The Sixth Circuit has also adopted this reasoning, noting that, "if the language in the indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant)." <u>United States v. Moss</u>, 9 F.3d 543, 559 (6th Cir. 1993), quoting <u>United States v. Thomas</u>, 875 F.2d

10

559, 562 (6th Cir. 1989).  See also United States v. Edwards, 72 F.Supp.2d 664, 667 (M.D. La. 1999), (naming of defendant charged with corruption in overt acts of RICO conspiracy with which he was not charged was neither prejudicial nor irrelevant, noting the exacting and strict standard against striking surplusage).

The District Court in United States v. DePalma, 461 F.Supp. 778 at 797 (SDNY 1978) wrote:

> The government may broadly allege that which it intends to prove and that which under applicable law it may prove.  The language of the indictment cannot be more prejudicial than the evidence offered to prove it. If the allegation is of matters by which the government hopes to establish the charge, then such allegations can scarcely be called surplusage." Citations omitted.

461 F.Supp. at 797.

The issue of alleged surplusage has arisen in the context of a defendant charged with subornation of perjury before the grand jury and obstruction of justice, charges similar to those in the instant case.  In United States v. Huppert, 917 F.2d 507, 510 (11th Cir. 1990), the indictment referenced that the grand jury was investigating money laundering, drug trafficking and other related offenses.  The defendant objected to the relevance of the grand jury's inquiries and the unduly prejudicial effect, particularly to the ominous associations with drug trafficking.  The Eleventh Circuit noted its confidence that a jury would be able to understand and

11

follow instructions from the Court and separate background information from the actual charges. Id.

The Eleventh Circuit in the same opinion addressed the issue of the relevance of evidence relating to the underlying money laundering scheme which was admitted at trial, agreeing that such evidence is admissible, if it "pertains to the chain of events explaining the context, motive, and set up of the crime which is properly admitted, if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or if necessary to complete the story of the crime for the jury," Id., at 512, citing United States v. Williford, 764 F.2d 1493, 1498 (11th Cir. 1985).

The Eleventh Circuit further noted that, in balancing substantial prejudicial against probative effect, "Rule 403 is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence. The balance under the Rule, therefore, should be struck in favor of admissibility," Huppert, 917 F.2d at 512, citing United States v. Norton, 867 F.2d 1354, 1361 (11th Cir. 1989).  See also United States v. Weinstock, 153 F.3d 272 at 279 (6th Cir. 1998).

The District Court for the District of Columbia has also addressed the issue of the relevance of background language in an indictment charging perjury, false statements, and obstruction of justice. The defendant, a former Secretary of the Interior, was charged with the same offenses as the instant defendant in relation

12

to an investigation by an Independent Counsel into corruption at HUD. United States v. Watt, 911 F.Supp. 538 (D. D.C. 1995). The Court declined to strike a 16-page introduction, noting that "the introductory section provides the background necessary for a jury to understand the full scope of defendant's activities, and to place defendant's conduct in the appropriate context . . .  Background information is particularly useful in cases involving perjury, false statements and obstruction of justice." Watt, 911 F.Supp. at 544.

The Sixth Circuit has repeatedly held in the context of admissibility of evidence at trial that: "a jury is entitled to know the 'setting of a case.' It cannot be expected to make its decision in a void - without knowledge of the time, place and circumstances of the acts which form the basis of the charge." See United States v. Roberts, 548 F.2d 665 at 667 (6th Cir. 1977).

More recently, the Sixth Circuit reviewed its history of acknowledging the admissibility of "background" or "res gestae" evidence in United States v. Hardy, 228 F.3d 745 (6th Cir. 2000). In Hardy, the Court found that evidence of drug transactions occurring six years prior to the formation of the charged drug conspiracy did not constitute proper background evidence, in that the evidence did not share temporal proximity, causal relationship, or a spatial connection to the charged offense. Id., at 748. Instead, the Court held that the evidence should have been analyzed under Rule 404(b), stating that:

> This Court has previously recognized
> the propriety of introducing

13

> 'background evidence' . . . Rather the
> very definition of what constitutes
> background evidence contains inherent
> limitations. <u>Buchanan</u>, <u>Paulino</u> and
> other cases teach that background or
> res gestae evidence consists of those
> other acts, the telling of which is
> necessary to complete the story of the
> charged offense . . . Proper
> background evidence has a casual,
> temporal or spatial connection with
> the charged offense. Typically, such
> evidence is a prelude to the charged
> offense, is directly probative of the
> charged offense, arises from the same
> events as the charged offense, forms
> an integral part of a witness's
> testimony, or completes the story of
> the charged offense.

<u>Harley</u>, 228 F.3d at 748.  Citations omitted.

The Sixth Circuit's criteria for admissibility of background evidence set forth in <u>Hardy</u> are listed in the disjunctive.  Evidence to be admissible must fit one of the delineated factors to be relevant. Here, the proffered background or res gestae evidence fits each of these factors-temporal, causal and spatial.  Bray's frame-ups were the precise actions which resulted in the Defendant's authoring the allegedly false reports and falsely testifying. The Mansfield buys all occurred over a two month period in a small geographical area and were the direct cause of the defendant's actions.  The Defendant's alleged criminal acts are undelibly interwoven and inextricably linked to Bray's deeds.

The evidence of the totality of the frame-ups predicates each of the charged crimes.  In order for the jury to be able to understand why either Bray or the Defendant took certain actions, the

jury must be able to view the progression of the investigation as a whole. It is the fact that Bray was controlling and manipulating what occurred, that caused the Defendant to need to manufacture and suppress evidence.

Although it is correct, as the Defendant states, that negligence or failure to control an informant is not a crime, lying in reports and testimony to conceal this lack of control and to falsely corroborate an informant, in order to gain convictions, are crimes. What occurred during the two month period in Mansfield, and the resulting consequences which played out in three federal courtrooms, is the whole story which the jury is entitled to hear. The relevance of this background evidence is particularly clear where, as here, the Defendant is charged with perjury, obstruction of justice, false statements, and civil rights charges, in that, in order for the finder of fact to determine whether the Defendant lied and impeded justice, it must be fully made aware of all of the facts as to what, in truth, occurred and how the justice system should have proceeded.

The government respectfully submits, that, in light of the overwhelming relevance of the events outlined in paragraph 8 of the Indictment, there is no need to address the issue of prejudice. However, the government further submits that the Indictment is clearly alleges that the plan to frame the innocent suspects is attributed to Bray alone. There is little likelihood - particularly

after the jury is charged - of these deeds being attributed to the Defendant.

As courts have often noted any probative evidence of a crime is prejudicial to the interests of the defendant. The Court's duty is to restrict only that evidence whose prejudicial effect overwhelms its probative value.  Particularly in the context of striking language from an indictment the burden is strict and on the moving party.  The government respectfully submits that this burden has not been met and to restrict the presentation of the evidence detailed in paragraph 8 of the Indictment would do a disservice to the jury in carrying out its function to determine the validity of the charges.

III.    <u>LIMITED PRETRIAL PUBLICITY DOES NOT WARRANT A CHANGE OF VICINAGE</u>

This case has not garnered sufficient publicity to prejudice the jury pool.  The only news outlet to devote any substantive resources to this matter has been the <u>Plain Dealer</u>.  There has been little to no television news coverage.  Despite Mr. Caniglia's attention to this, and related, proceedings, the totality of coverage received has not been of a poisonously prejudicial nature.

A jury pool may be prejudiced by pretrial publicity if either (1) the pretrial publicity amounts to a "carnival atmosphere," or (2) a review of the extent and nature of the publicity and the potential jurors' responses during voir dire reveals such prejudice. <u>Nevers v. Killinger</u>, 169 F.3d 352 (6th Cir. 1999); *overruled in part on other grounds*, <u>Harris v. Stovall</u>, 212 F.3d 940 (6th Cir. 2000). To date, neither prong has been triggered.

Pretrial media coverage alone is not enough to establish a carnival-like atmosphere; instead the "inflammatory, circus-like atmosphere" must "pervade[] both the courthouse and surrounding community." Foley v. Parker, 488 F.3d 377, 387 (6th Cir. 2007). A classic example occurs when, immediately prior to the trial, the media published the Defendant's confession to twenty-four burglaries, six murders, and a plea bargain attempt to avoid capital punishment. Irvin v. Dowd, 366 U.S. 717, 728 (1961). Another court described the phenomena as an "avalanche of television, radio and newspaper publicity." U.S. v. Ford, 812 F. Supp. 761, 772 (W.D. Tenn. 1991). Because this is a demanding standard, any finding of pretrial prejudice due to media coverage is rare. U.S. v. Angelus, 258 Fed. Appx. 840, 845 (6th Cir. 2007); DeLisle v. Rivers, 161 F.3d 370, 382 (6th Cir. 1998).

Potential jurors' responses during voir dire may lead the court to conclude that there is a presumption of community-wide prejudice or actual prejudice. Nevers, 169 F.3d at 364. Presumed prejudice occurs where it is obvious from jury questioning that the community, as a whole, may be imputed as deeply hostile. Murphy v. Florida, 421 U.S. 794, 803 (1975) (finding the community hostile when over 90% of potential jurors admitted to disqualifying prejudices). Actual prejudice occurs where the selected jurors admit that they consider the defendant guilty before hearing any evidence in trial. Irvin, 366 U.S. at 728. Having not yet received any responses to voir

17

dire questionnaires, no juror feedback yet supports a change of vicinage.

There has been no circus-like atmosphere surrounding the instant case. The Defendant believes that Mr. Caniglia of the <u>Plain Dealer</u> made "a career" out of reporting "every conceivable aspect" of the Mansfield cases, the subsequent release of the convicted defendants, and the connection between the Defendant and Jerrel Bray. Defendant's Brief at pp. 23 - 25. This is a gross overstatement. Of the thirty articles written by Mr. Caniglia submitted as Exhibit A, twelve were written in 2007, ten in 2008, and eight in 2009. Aff. Thomas Roth, Ex. A (Sept. 10, 2009). Searching for articles written by Mr. Caniglia on the <u>Plain Dealer's</u> website, reveals he has written, co-written, or contributed to, approximately 4,530 articles, sixteen in the past week alone. http://search.cleveland.com/ John+caniglia (accessed October 9, 2009). Only 0.66% of Mr. Caniglia's articles were included in Exhibit A - hardly constituting "a career." Moreover, thirty articles written over a three year period hardly exhibits a circus-like atmosphere, as contrasted with "an avalanche of television, radio and newspaper publicity" both during and following a mistrial. <u>Ford</u>, 812 F. Supp. at 772.

The community of potential jurors may have knowledge either of the crime or putative criminal and still render a constitutionally fair verdict. <u>Angelus</u>, 258 Fed. Appx. at 845. It is only where the trial atmosphere is "utterly corrupted" by the media that prejudice will be found. <u>Id</u>.No such atmosphere currently exists.

18

IV.     THE GOVERNMENT HAS PROVIDED MORE PARTICULARS THAN THAT TO
        WHICH DEFENDANT IS LEGALLY ENTITLED

        A. ADDITIONAL PARTICULARS PROVIDED BY LETTER OF SEPTEMBER
           2, 2009 AND IN INSTANT RESPONSE

        The government responded to the Defendant's request for a
Bill of Particulars by voluntarily providing a response outlining
specific acts of misconduct which the government intends to prove, in
order to establish that the Defendant intentionally lied, manufactured
evidence and concealed exculpatory evidence, in order to obstruct
justice pertaining to victims specified in Counts 1 through 7, and to
violate the civil rights of the victims identified in counts 16, 17,
and 18. See Defendant's Exhibit E. These victims, as were addressed
in the government's  reply to the request for a Bill of Particulars,
are:

                   1.    Counts 1 and 16 (para8(b)) : Lowestco Ballard

                   2.    Count 2 (para 8(e)): Noel Mott

                   3.    Counts 3 and 17 (para 8(f)): Dwayne Nabors

                   4.    Count 4 (para 8(h)): Roosevelt Williams

                   5.    Count 5 (para 8(j)): Joshawa Webb

                   6.    Counts 6 and 18 (para 8(k)): Geneva France

                   7.    Counts 7 (para 8(m)): Danny Lee Brown

        In relation to each of these seven buys, the Defendant has
been provided copies of all DEA and other law enforcement files which
contain all reports, video and audio tapes, photographs, telephone
toll records and any other type of physical evidence. The defendant
additionally has been provided with the Defendant's grand jury

testimony and has the transcripts from the trials and relevant hearings. With the exception of witness statements, the Defendant has all of the evidence available to the government. Additionally, it may be noted, that the Defendant was physically present at each of the buys and authored most of the relevant reports. It should be further noted, that, as to each buy, the original case file rarely contains more than one sparse report (usually only two or three pages) and brief tapes of conversations or videos. Therefore, the Defendant is not confronted with having to sift through volumes of evidence, in order to identify relevant documents. In conjunction with the full disclosure of all relevant evidence, the Indictment, together with the government's original response to the request for Bill of Particulars, provides the Defendant with sufficient notice to prepare his defense and preclude potential double jeopardy without the government having to provide the nuances and details of its evidence. Taking the Indictment in conjunction with the government's response of September 2, 2009 (Defendant's Exhibit E), the following provides a summary of that which has already been made known to the Defendant. The government suggests that this level of detail far exceeds that which is legally required as further discussed supra.

      1.   As to Count 1, the Lowestco Ballard buy, the Indictment alleges that Lowestco Ballard was set up by Bray who received drugs from CI-1 (his real source) in an apartment complex parking lot. Bray identified C-1, who he met out in the open, as being Ballard. (para 8(b)). The Indictment further alleges that the

20

defendant falsely claimed in his DEA-6 report that a black Toyota (the load car) pulled up beside him in the parking lot and that, later, as it was parked near Bray and "Ballard", the Defendant observed an exchange between its female passenger and "Ballard" (Count 8). The Indictment further alleges that the Defendant perjured himself at both the detention hearing and at trial by testifying, that, at the conclusion of the deal, he pulled up beside and identified Ballard as being the person who met and dealt with Bray.

In addition to the specific charges, the government alleges in its reply that the DEA-6 incorrectly stated that Bray and his car were searched after the deal, and that the telephone number dialed had been monitored. The reply additionally alleges that the defendant falsely identified the recipient of one of the recorded calls, and that at trial the defendant falsely claimed to have verified his identification of Ballard. Finally, it is alleged the defendant provided to the defense and the court a copy of the buy video from which the audio portion had been re-dacted.[3]

Through discovery the Defendant has all of the information relevant to these acts. The DEA-6 is a mere three pages. There are only a handful of telephone calls, and the Defendant has the trial

---

[3]In relation to the DEA-6 reports, the government, in an attempt to employ a neutral term, referred to the factual inaccuracies as "errors". It is the governments contention that these inaccuracies were intentional. It will, of course, be up to the jury to determine whether each individual inaccuracy was accidental or intentional. Thus, the government's use of the neutral term "errors" at this stage of the proceedings.

transcript wherein he purports to have made efforts to confirm his identification of Ballard. The defendant has the copy of the video with sound.

2. The Indictment (para 8(e)) alleges that Bray set up Noel Mott by arranging a deal with C-1 (his real source) and then telling the Defendant that he had made the purchase from Mott. The government's reply further sets forth that the DEA-6 incorrectly states that the Defendant and another detective observed Mott enter Bray's car, that two calls to Bray were monitored (Bray in fact called CS-1's number not the number attributed to Mott in the report), and incorrectly documents the events surrounding the post-buy search of Bray's car and the return of the buy money. Again, the Defendant has the DEA-6 which documents the return of the buy money and the relevant tape.

3. The Indictment alleges (para 8(f)) that Bray met with two individuals in a parking lot to negotiate the purchase of ½ kilo of cocaine and, thereafter, falsely identified one of the persons, as being Dwayne Nabors. Bray later consummated the purchase in two stages, the second being at a residence on Hill Street. The defendant is charged at Count 11 with having falsely testified at trial to having, together with Detective Metcalf, pulled up beside and identifying "Nabors" as being the driver at the first meet (Count 11) and with having observed Nabors car at the final meet on Hill (Count 12).

The government's reply sets forth numerous additional inaccuracies. It alleges the DEA 6 was drafted to include the aforementioned mis-identifications and to document that numbers dialed were monitored. The reply goes on to list seven areas relating to mis-statements about identifications, the absence of a video tape, and improper transcription of a taped call. Again the Defendant has the report of the buy together with the audio and video tapes and, of course, the trial transcripts. The report is short and concise and the tapes are not lengthy.

4.  As to the Roosevelt Williams buy (para 8(h) and Count 4), the Defendant complains in his brief of a lack of notice as to what exculpatory information was withheld. The relevant DEA 6 describes the buy in three short paragraphs, two sentence of which, relate to surveillance. The government's reply sets forth that the government intends to establish that the actual observations by officers on the scene will directly contradict what was placed and/or not placed in the Defendant's report. The reply additionally alleges that the Defendant failed to document or disclose relevant information relating to the automobile driven to the scene by "Williams". To be more specific, that "Williams" arrived driving Bray's automobile.

5.  The Defendant also complains as to a lack of notice as to his allegedly criminal conduct relating to Joshawa Webb (para 8(j) and Count 5). The Indictment alleges that Bray set up a deal wherein "Webb", who was actually C-5, met with Bray and the Defendant in a car, and that Bray and C-5 sold crack to the Defendant. The DEA

6 contains one paragraph describing the deal. The government's reply clearly advises that the reports reference to "Webb" handing the Defendant the crack and scale is allegedly false. The reply further alleges that the sole reference in the report to monitoring a call is false, and that the sole reference to there having been a meeting among Bray and the officers prior to the deal is allegedly false.

       6.    The Defendant also complains about the France buy (para 8(k) and Counts 6, 13, 14). The Indictment specifically alleges that Bray utilized C-6 to deliver drugs purportedly on behalf of Ron Davis, who, in fact, was not involved in the transaction. Bray, at trial corroborated by the Defendant, identified C-6 as Geneva France. The government's reply sets forth a series of inaccuracies in both the Defendant's report and testimony, many of which relate to false statements in regards to the telephone calls setting up the deal. (This is also the subject of the perjury Counts 13 and 14). All of the information to which the government's reply refers is contained in the three page DEA 6, the tapes of the calls and the buy, and the defendant's testimony at trial. The Defendant asserts that the Defendant's having corroborated Bray's account of telephone calls made to "Davis" - could not have impacted on France's right to a fair trial, since Davis had pled to an unrelated count (later dismissed in that the underlying search warrant was premised upon false information) and was not on trial. In fact, the Defendant effectively undermined France's counsel's efforts to attack Bray's credibility and

24

to establish that Bray was manipulating the entire scene by perjuriously confirming Bray's lies regarding the calls.

      7.    The Indictment alleges as to the buy from Danny Lee Brown, that Bray faked a call to Brown, and thereafter had C-7 deliver crack to him in an alley (para 8(m)). It is further alleged that the Defendant subsequently, perjurously identified Frank Douglas as being the courier (Count 15). The government's reply specifies, that, in addition, the Defendant's report inaccurately attributes an observation to Detective Metcalf and inaccurately reports that Bray selected Frank Douglas from a photo spread. In that the DEA 6 only reports one observation by Detective Mecalf, there can be no confusion as to which observation by Detective Metcalf is being challenged.

      As outlined above, the government has gone well beyond the notice requirements for a Bill of Particulars and the government respectfully submits that the Defendant is not entitled to any further details of the government's evidence.

      B. THE INFORMATION PROVIDED BY THE GOVERNMENT EXCEEDS THAT REQUIRED BY THE LAW

      The purpose of a Bill of Particulars is to inform the accused of the charges against him in sufficient detail to enable him to prepare his defense, to minimize surprise, and to bar his being placed in jeopardy in a subsequent prosecution for the same offense. Wong Tai v. United States, 273 U.S. 77, 82 (1927); United States v. Smith, 692 F.2d 693, 696 (10th Cir. 1982); United States v. Giese, 597 F.2d 1170, 1180 (9th Cir. 1979), cert. denied, 444 U.S. 979 (1979); United States v. Hill, 589 F.2d 1344, 1351-52 (8th Cir. 1979), cert.

denied, 442 U.S. 919 (1979); <u>United States v. Cantu</u>, 557 F.2d 1173, 1178 (5th Cir. 1977), <u>cert</u>. <u>denied</u>, 434 U.S. 1063; <u>United States v. Birmley</u>, 529 F.2d 103, 108 (6th Cir. 1976).

As the Court of Appeals for the Sixth Circuit stated:

> The purposes of a bill of particulars are to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, to avoid or minimize the danger of surprise at the time of trial, and to enable him to plead his acquittal or conviction in bar of another prosecution for the same offense when the indictment itself is too vague, and indefinite for such purposes. <u>United States v. Haskins</u>, 345 F.2d 111 (6th Cir. 1965).

> <u>Zedner v. United States</u>: 547 U.S. 489, at 501 (2006).

A Bill of Particulars is not a constitutional requirement, <u>Wardius v. Oregon</u>, 412 U.S. 470, 475 (1973), and is addressed to the sound discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of a clear abuse of discretion. <u>Will v. United States</u>, 389 U.S. 90, 99 (1967); <u>Wong Tai v. United States</u>, 273 U.S. 77, 82 (1927); <u>United States v. Key</u>, 717 F.2d 1206, 1210 (8th Cir. 1983); <u>United States v. Giese</u>, 597 F.2d at 1180; <u>United States v. Fischbach & Moore, Inc.</u>, 576 F.Supp. 1384, 1388 (W.D. Pa. 1983).

Where available, it is not designed to afford the defense a detailed preview of the government's case or to tie the prosecutor in advance of trial developments to proof of particular events by particular witnesses. <u>United States v. Perez</u>, 489 F.2d 51, 70-71 (5th Cir. 1973), <u>cert</u>. <u>denied</u>, 417 U.S. 945 (1974); <u>Hickman v. United States</u>, 406 F.2d 414, 415 (5th Cir. 1969), <u>cert</u>. <u>denied</u>, 394 U.S. 960 (1969). <u>Accord</u>. <u>United States v. Joseph</u>, 510 F.Supp. 1001, 1005 (E.D.

26

Pa. 1981); <u>United States v. Deaton</u>, 448 F.Supp. 532, 537-538 (N.D. Ohio 1978).

Specifically, it may not be employed by the defendant to secure information as to the government's legal theories. <u>United States v. Shoher</u>, 555 F.Supp. 346, 349 (S.D. N.Y. 1983); <u>United States v. Marks</u>, 364 F.Supp. 1022, 1030 (S.D. N.Y. 1973), <u>affirmed</u>, 520 F.2d 913 (6th Cir. 1975), (reversed on other grounds), 430 U.S. 188; <u>United States v. Leonelli</u>, 428 F.Supp. 880, 882 (S.D. N.Y. 1977), nor may it be used to discover the identity of all of the government's witnesses, <u>United States v. Dreitzler</u>, 577 F.2d 539, 553 (9th Cir. 1978), <u>cert</u>. <u>denied</u>, 440 U.S. 921 (1979); <u>United States v. Sanders</u>, 462 F.2d 122, 123 (6th Cir. 1972); <u>United States v. Marks</u>, <u>supra</u>, 364 F.Supp. at 1030; or evidence which it intends to introduce at trial; <u>United States v. Matlock</u>, 675 F.2d 981, 986 (8th Cir. 1982); <u>United States v. Colson</u>, 662 F.2d 1389, 1391 (11th Cir. 1981); <u>United States v. Armocida</u>, 515 F.2d 49, 54 (3d Cir.), <u>cert</u>. <u>denied</u>, 423 U.S. 858 (1975); <u>United States v. Germain</u>, 411 F.Supp. 719, 727-728 (S.D. Ohio 1975); <u>United States v. Marks</u>, <u>supra</u>; or which could be discovered by the defendant by means of a Rule 16 motion, <u>United States v. Isaacs</u>, 364 F.Supp. 895, 899 (N.D. Ill. 1973), <u>affirmed</u>, 493 F.2d 1124 (7th Cir.), <u>cert</u>. <u>denied</u>, 417 U.S. 976 (1974); <u>see</u> <u>also</u>, <u>Benes v. United States</u>, 276 F.2d 99 (6th Cir. 1960).

In summary, in a Bill of Particulars, the government is not required to lay before the accused its entire case. <u>American Tobacco Co. v. United States</u>, 147 F.2d 93, 117 (6th Cir. 1945), <u>affirmed</u>, 328

27

U.S. 781 (1946).  Nor is a Bill of Particulars necessary where the indictment is not vague and is specific enough to satisfy the purposes of a Bill of Particulars.  United States v. Finegan, 189 F.Supp. 728, 729 (N.D. Ohio 1960).

Within the framework of the foregoing, we turn now to a discussion of various areas which are encompassed by the specific requests of the defendant in the instant matter.

In considering whether to grant a Bill of Particulars, courts have considered as major factors the specificity of the entire indictment and the extent of discovery provided by the government. Wong Tai v. United States, supra, 273 U.S. at 82-83 (1927); United States v. Long, 706 F.2d 1044, 1054 (9th Cir. 1983); United States v. Gabriel, 715 F.2d 1447, 1449 (10th Cir. 1983); United States v. Armocida, 515 F.2d 49, 54-55 (3d Cir. 1975), cert. denied, 423 U.S. 858 (1975); United States v. Fischbach and Moore, Inc., supra, 576 F.Supp. at 1388; United States v. Kilroy, 523 F.Supp. 206, 211 (E.D. Wis. 1981).

As the cases cited by the defendant affirm, it is well established that the defendant is not entitled to know all of the government's evidence, but only the theory of the government's case. In analyzing a request for a Bill of Particulars, the Court should look not only to the indictment but to the amount of discovery and any briefs or other filings. See United States v. Kendall, 665 F.2d 126, 138 (7th Cir. 1981) and United States v. Chalmers, 410 F.Supp 2.d 278, 284 (S.D.NY 2006).

28

In the present case, the Bill of Particulars is not to be used to conduct discovery of the government's theory of the case, to force disclosure of acts underlying a charge, or to restrict the government's proof at trial. United States v. Perez, 489 F.2d 51, 70 (5th Cir. 1973), cert. denied, 417 U.S. 945 (1974); United States v. Mannino, 480 F.Supp. 1182, 1185 (S.D. N.Y. 1979); United States v. Rosenfeld, 264 F.Supp. 760, 762 (E.D. Ill. 1967).

In United States v. Goldman, 439 F.Supp. 337, 353 (S.D. N.Y. 1977), the Court held that requests for the manner in which an individual "did cause" an act alleged in the indictment to be performed, the "means used" to achieve an object apart from the means outlined in the indictment, and the date and place of the preparation and sending of an item call for disclosure that would unduly limit the government's proof at trial.

The detailed information provided by the government to date, through the Indictment, its response to the original request for a Bill of Particulars and in the instant Response, far exceed that which is legally required. Accordingly, the government should not be compelled to provide the Defendant with further Particulars.

V.     DEFENDANT WAIVED ANY PRIVILEGE ASSOCIATED WITH THE DISSEMINATED MEMORANDA

Defendant Lucas' affidavit fails to justify the public dissemination of the various "privileged" memoranda. The Defendant admits that he provided these memoranda to co-defendants in the related civil cases. However, he fails to specifically assert that he did *not* provide them to those who are not co-defendants. Further, the

29

Defendant's affidavit fails to describe the precise circumstances of the dissemination to co-defendants that would be required to invoke joint defense protection. Without specific testimony from Defendant Lucas about the facts and circumstances surrounding his dissemination, the opportunity to cross-examine Defendant Lucas to test credibility of that which has been asserted and elicit relevant, omitted facts; and the opportunity for the government to present independent testimony to specifically refute the testimony of Defendant Lucas, these memoranda cannot be deemed to be privileged.

The joint defense privilege arises where confidential communications are shared between co-defendants which are "part of an on-going and joint effort to set up a common defense strategy." U.S. v. Moss, 9 F.3d 543, 550 (6th Cir. 1993), quoting Haines v. Liggett Group Inc., 975 F.2d 81, 94 (3d Cir. 1992). Because the privilege arises out of the attorney-client privilege, at least one of the co-defendants' attorneys must be present when the communication is made. See U.S. v. McPartlin, 595 F.2d 1321, 1336 (7th Cir. 1979) (protecting statements made to a co-defendant's attorney); U.S. v. Hsia, 81 F. Supp. 2d 7, 16 (D.D.C. 2000) (a joint defense agreement "permits a client to disclose information to her attorney in the presence of joint parties and their counsel"); Schachar v. Am. Acad. of Ophthalmology, Inc., 106 F.R.D. 187, 192 (N.D. Ill. 1985) ("any joint privilege still extends only to *confidential* communications from a

30

client to his attorney"). Defendant Lucas' affidavit fails to allege that any attorney was present at the time of dissemination.

The purpose of the joint defense privilege is to allow parties working towards a common purpose to benefit from the advice of both counsel. Libbey Glass, Inc. v. Oneida, Ltd., 197 F.R.D. 342, 347 - 48 (N.D. Ohio 1999). Because attorneys are required to strategize a legal defense, if no attorneys are present when a communication is made, the inference is that any communication was *not* intended to be used for a legal defense, let alone a joint defense. U.S. v. Bay State Ambul. and Hosp. Rental Service, Inc, 874 F.2d 20, 29 (1st Cir. 1989); see Libbey, 197 F.R.D. at 348. Any extension of this privilege, including to communications made between the co-defendants themselves, "is supported neither in law nor in logic." U.S. v. Gotti, 771 F. Supp. 535, 545 (E.D. N.Y. 1991). As no attorneys were present, Defendant Lucas' dissemination constitutes a waiver of any asserted privilege.

Defendant Lucas' affidavit appears to admit that he turned the summary memorandum over to other law enforcement officials sued in civil suits without the advice or consent of his attorneys. Aff. Lee Lucas ¶ 5 (Sept. 10, 2009). It was his "understanding that these summary memorandum . . . would be used by my and the other co-defendants' civil attorneys . . . ." Aff. Lee Lucas ¶ 5 (Sept. 10, 2009). These admissions are inconsistent with an intent to maintain any privilege associated with these memoranda. If the Defendant truly

intended that these memoranda be used to formulate a legal defense, he would have delivered them to the attorneys directly, not to the other law enforcement officials with the "understanding" that they would deliver the memorandum to their attorneys.  Aff. Lee Lucas ¶ 5 (Sept. 10, 2009).

If the privilege is to attach when no attorneys are actually involved in the delivery a defendant must have taken "deliberate and meaningful steps" to ensure that the communications remain confidential.  Libbey Glass, Inc., 197 F.R.D. at 348.  Absent this showing, it would be possible for one party to thrust the privilege upon another, who in turn might not understand that the documents in his or her possession were actually privileged communications.  Id. at 349.  Where no efforts are made to ensure that the communications are "safeguarded," the privilege is considered to be  waived.  Id.

When the Defendant said that it was his understanding that the others would give the summary memorandum to their attorneys, he implied that he gave them the document of his own volition, without consulting an attorney.  Aff. Lee Lucas ¶ 5 (Sept. 10, 2009). Furthermore, in his affidavit, the Defendant never mentioned any "deliberate and meaningful" actions which he took to ensure that the other law enforcement officials understood the confidential nature of the memorandum.  By saying that it was his "understanding" that the memorandum would be used for the expected civil litigation does not suggest anything "deliberate" or "meaningful" in attempting to ensure

that the other law enforcement officials knew the confidential nature
of the communications.   Aff. Lee Lucas ¶ 5 (Sept. 10, 2009). The
moment the Defendant gave the memorandum to other law enforcement
officials, he waived any privilege that he might have had under any
real or imagine d joint defense agreement.

Moreover, the fact that one party operated under the subjective
belief that there was a joint defensive effort is not enough to raise
the privilege.   There must be some sort of meeting of the minds
between the parties regarding what exactly it is that they are
formulating a strategy for.   Thus a communication is not privileged
unless there is a complete unity of purpose among both parties. U.S.
v. Weissman, 195 F.3d 96, 100 (2d Cir. 1999)(not privileged
communication where one party thought communication was prepared for
use at a congressional hearing regarding his company and the other
party prepared it for a potential prosecution of himself, of which the
former was unaware).

Defendant Lucas spontaneously gave third parties this summary
memorandum with the understanding that they would in turn give it to
their respective attorneys for defense in a civil suit.   Aff. Lee
Lucas ¶ 5 (Sept. 10, 2009).   These civil co-defendants are not a part
of the Defendant's criminal case.   Because the purpose of the
privilege is to protect documents exchanged between attorneys in
formulating a strategy for their clients, it does not apply here.   The
ongoing purpose of the disclosure, if it fell within the privilege at

33

all, was to prepare for a civil case and not to defend the Defendant in a criminal trial.  Therefore the memorandum cannot be protected by the privilege.

Defendant Lucas' affidavit fails to set out the necessary facts to afford any protections to these memoranda.  Further, the government must have an opportunity to cross-examine the Defendant on the substance of his affidavit – on the grounds of both veracity and completeness.  The government must also be afforded an opportunity to present its own evidence to rebut that testimony offered by Defendant Lucas at such a hearing.  Accordingly, the government will be prepared to both cross-examine Defendant Lucas and, if necessary, present additional evidence at the pretrial hearing currently scheduled before the Court on December 1, 2009 should the Court wish to hear such evidence.

VI.      GOVERNMENT HAS PROVIDED TIMELY NOTICE OF 404(b) EVIDENCE

A. Evidence offered, _inter alia_, Pursuant to Federal Rules of Evidence 404(b)

In response to the Defendant's request for notice under Rule 404(b), the government provides the following evidence that it intends to offer both as relevant, intrinsic evidence under Rule 402 as well as an alternative ground of admissibility under Rule 404(b).

1. On September 13, 2005, the Defendant, did knowingly and willfully make a false writing or document knowing the same to contain a materially false, fictitious and fraudulent statement and entry that is, the defendant, authored a DEA Form 6, dated September 13, 2005,

34

captioned "Purchase of Ex-4 on 9-13-05" wherein the defendant, wrote that:

"At approximately 3:05 PM, TFO V. and Capt. F. observed a black male, wearing a white jersey with green #24 in it, enter the CS' vehicle."  Whereas, in truth and fact, the Defendant well knew that these officers had not advised him that they had observed this individual enter into the informant's vehicle.

"At approximately 3:08 PM, S/A Lucas and Sgt M. observed this black male exit the CS' vehicle and walk into a driveway." Whereas, in truth and fact, the Defendant, well knew that neither he nor the other officer observed this individual exiting the informant's vehicle.

2. On September 15, 2005, the Defendant, did knowingly and willfully make a false writing or document knowing the same to contain a materially false, fictitious and fraudulent statement and entry that is, the defendant, authored a DEA Form 6, dated September 15, 2005, captioned "Purchase of Ex-5 from N.M. on 09-15-05," "wherein the defendant, wrote that:

"The CS returned the remaining $780,000 OGF (Official Government Funds) to S/A Lucas.  The CS and his/her vehicle were again searched with negative results for any drugs or money." Whereas, in truth and fact, the Defendant well knew that the $780.00, which constituted the non-spent remainder of proceeds forwarded to the informant for a controlled drug purchase, had been secreted by the

35

informant and then recovered by law enforcement officers during a search of the informant's vehicle at the conclusion of the drug buy, after the informant had already claimed to have spend the entire amount forwarded to him for the purchase.

3. On September 20, 2005, the Defendant, did knowingly and willfully make a false writing or document knowing the same to contain a materially false, fictitious and fraudulent statement and entry that is, the Defendant, authored a DEA Form 6, dated September 20, 2005, captioned "Purchase of Ex-7A and Ex-7B," wherein the Defendant, wrote that:

"At approximately 3:26 PM, S/A Lucas and Det. Metcalf observed Nabors and an unidentified black male with dread locks arrive driving a black Cadillac .... At approximately 3:30 PM, S/A Lucas and Detective Metcalf observed Nabors and FNU LNU (first name unknown, last name unknown) to depart in this Cadillac." Whereas, in truth and fact, the Defendant well knew that neither he nor Detective Metcalf had observed or identified, Nabors at the location.

"At this time, TFO A. searched the CS with negative results for any drugs on money and accompanied the CS to 460 Hill Street, at approximately 9:01 PM. Parked at the residence was the black Cadillac, Ohio Tag number that had been observed parked at "Nabors'" business "Platinum States", whereas, in truth and fact, the Defendant, well knew that he had not observed, nor had it been relayed to him by anyone else that the referenced Cadillac was observed or present at

36

this residence.

4. On October 11, 2005, the Defendant, did knowingly and willfully make a false writing or document knowing the same to contain a materially false, fictitious and fraudulent statement and entry that is, the Defendant, authored a DEA Form 6, dated October 11, 2005, captioned "Purchase of Ex-11 from Johnny Robertson," wherein the Defendant wrote that:

"At this time, the black male wearing camouflage arrived back at Joe and Mary's Market and gave TFO A. a bag of crack weighing approximately 87.4 gross grams (Ex-11). TFO A. gave this male the $2,000.00 buy money, and watched this male give Robertson the buy money." Whereas, in truth and fact, the defendant, well knew that he had not been told by TFO A. nor anyone else, and had no basis to believe that TFO A. had observed the referenced individual pass the buy money to Robertson.

5. On October 14, 2005, the Defendant, did knowingly and willfully make a false writing or document knowing the same to contain a materially false, fictitious and fraudulent statement and entry that is, the Defendant authored a DEA Form 6, dated October 14, 2005, and captioned "Purchase of Ex-12 from Joshawa Webb and Acquisition of N-17 and N-18" wherein the defendant, wrote that:

"... As S/A Lucas pulled into the lot, S/A Lucas observed the CS, who was standing outside of a vehicle. S/A Lucas met the CS and S/A Lucas get into the back seat, while the CS got into the

37

driver's seat.  Seated in the front passenger seat was Joshawa Webb
The CS introduced S/A Lucas as Todd to Joshawa Webb.  Webb removed a
clear plastic bag that contained two clear plastic bags containing
about an ounce of crack each, a remaining 12 grams of crack was inside
of the first clear plastic bag and handed this to S/A Lucas.  Webb
removed a small black scale from his front pocket and turned on the
scale.  S/A Lucas placed each of the bags on the scale.  The two
larger bags weighed about 29 grams each, while the remaining crack
weighed about 12 grams.  S/A Lucas advised Webb that the smaller
amount was "light", but that it was OK.  S/A Lucas then gave Joshawa
Webb: $2,600.00 OGF.  $2,500.00 was for the crack, while $100 for
supposed to be for the CS. Webb counted this money on his lap.  Webb
did not talk during the weighing of the crack or the counting of the
money.  When Webb had finished counting, S/A Lucas asked Webb if they
could work, Webb responded "Yeah."  S/A Lucas then departed the
vehicle at approximately 4:07 PM."  Whereas, in truth and fact, the
Defendant, well knew that the individual in the front passenger seat-
purported to be Webb did not remove a bag containing cocaine from
anywhere, nor a scale from his front pocket, in that this cocaine and
scale were handed to the defendant, by the informant.

6. On July 17, 2006, the Defendant, while under oath as a
witness in the trial of United States v. Dwayne Nabors, et al., in the
United States District Court for the Northern District of Ohio, did
knowingly make a false and material declaration in that the Defendant

38

did falsely testify that he confirmed his identification of Lowestco Ballard at the conclusion of the drug transaction by looking at photographs of four individuals.

7. On July 17, 2006, the Defendant, while under oath as a witness in the trial of <u>United States v. Dwayne Nabors, et al.</u>, in the United States District Court for the Northern District of Ohio, did knowingly make a false and material declaration in that the Defendant did falsely testify that he had maintained surveillance on Bray during the Parker/Ward buy, so as to preclude Bray from being passed drugs by an associate.

8. On July 17, 2006, the Defendant, while under oath as a witness in the trial of <u>United States v. Dwayne Nabors, et al.</u>, in the United States District Court for the Northern District of Ohio, did knowingly make a false and material declaration in that the Defendant, did falsely testify that he had been able to identify Frank Douglas as the individual entering and exiting Bray's car on the November 8, 2005, Danny Brown buy.

9. On February 14, 2006, the Defendant, while under oath as a witness in a trial of <u>United States v. Geneva France, et al.</u>, in the United States District Court for the Northern District of Ohio, did knowingly make a false and material declaration in that the defendant, did falsely testify that he had been aware that Bray telephoned C.J. during the France buy and that J. had been a subject of an investigation.

10. Further, the government incorporates by reference, as if more fully set forth herein, all information and facts detailed in it's responses to Defendant's requests for Bill of Particulars, both by (letter of September 2, 2009 and in Section F of the instant Response).

B. THE LAW SUPPORTS THE SUFFICIENCY OF THE GOVERNMENT'S NOTICE UNDER RULE 404(b) AND THE ADMISSIBILITY OF THE NOTICED EVIDENCE

Rule 404(b) provides in relevant part:

Evidence of other crimes, wrongs, or acts is not admissible to prove character of a person in order to show conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, . . .

Before admitting prior acts evidence, the district court must determine that the evidence is relevant under FRE 401, is admissible for a proper purpose, and that the probative value of the evidence outweighs its potential prejudicial effects. United States v. Passarella, 788 F.2d 377, 383 (6th Cir. 1986); see also, United States v. Dabish, 708 F.2d 240, 242 (6th Cir. 1983). Further, the prior acts generally must be relevant to a matter in issue and must be substantially similar to, and near in time to, the offense charged in the indictment. Id.; see also, United States v. Hamilton, 684 F.2d 380, 384 (6th Cir.), cert. denied, 103 S.Ct. 312 (1982). Additionally, the Sixth Circuit has viewed Rule 404(b) as a rule of inclusion rather than exclusion. United States v. Bakke, 942 F.2d 977, 981 (6th Cir. 1991), cert. denied, 114 S.Ct. 2114 (1994).

40

Beyond a mere recitation of the laundry list of proper considerations enumerated in Rule 404(b), the government is required to identify the specific purpose or purposes for which the evidence of prior wrongs or crimes is being offered. United States v. Merriweather, 78 F.3d 1070, 1076 (6th Cir. 1996). The district court must then clearly instruct the jury as to the specific purpose for which they may consider the evidence. Id.

In the case sub judice, the charged conduct entails the manufacture of inculpatory evidence, suppression of exculpatory evidence and perjury over nearly a year long period. All of the above listed evidence occurring during the same course of conduct, is intrinsic to the proof of the charged conduct, and is inextricably linked with the evidence of the charged conduct. Accordingly, the government suggests that the above listed evidence is first admissible under F.R.E. 402. The government sets out the specific evidence herein pursuant to F.R.E. 404(b) simply as a prophylactic measure to ensure notice to the Defendant and the Court of the alternative ground of admissibility in order to address this in advance of trial. See United States v. Barnes, 49 F.3d 1144, 1149 (6th Cir. 1995)

VII.    F.R.EVID. 608(b) AND THE DOCTRINE OF JUDICIAL ESTOPPEL
        PERMIT CROSS-EXAMINATION ON DEFENDANT'S PRIOR MISCONDUCT

The Defendant seeks to prohibit the government from utilizing three instances of the Defendant's prior conduct that are probative of the Defendant's untruthfulness. The Defendant refers to a series of prior investigations into the Defendant's actions by the

41

Federal Bureau of Investigation (FBI) and the Drug Enforcement Administration's, Office of Professional Responsibility (DEA -OPR), along with two prior federal court opinions: United States v. Gavina-Pena,(1:02CR449 N.D. of Ohio, Judge Economus, March 11, 2003) and United States v. Novaton, 271 F.3d 968 (11th Cir. 2001).

As to the FBI and DEA-OPR investigations, although the government does not concur that, "all of these investigations resulted in Defendant Lucas being completely cleared of all wrongdoing," the government will not attempt to impeach the Defendant on these matters during cross-examination. Similarly, although Judge Economus' redacted opinion impugns the Defendant's veracity, the government does not intend to inquire into this matter either.[4]

As to the Novaton opinion, however, the government will seek to cross-examine the Defendant with this matter, in as much as it is particularly probative of the Defendant's untruthfulness.

In Novaton, the Eleventh Circuit Court of Appeals reviewed, inter alia, the denial of the district court's granting of a Franks motion based upon a series of Title III, wire tap, affidavits authored by the Defendant. The Circuit found that the uncontested evidence from the record established that the Defendant's statement in his affidavit that four confidential sources had established prior reliability

---

[4]The government would respectfully request to reserve the right to readdress these matters at trial should some unforseen door be opened by the Defendant's testimony or other evidence offered.

through cooperation with law enforcement authorities was not true. In fact, three of the four sources had never before cooperated. Although the Circuit found that the affidavits were sufficient to establish probable cause absent these references, the Circuit wrote:

> "We find troubling Agent Lucas' apparent misrepresentations concerning the past cooperation of the informants based in this case. Although the government maintains that there was an absence of proof concerning the agents deliberateness or recklessness in making the misrepresentation, it is unclear how Agent Lucas could have made such statements of an affirmative character for which there was no basis without having acted either deliberately or recklessly. Accordingly, we will assume that this was a deliberate or reckless misrepresentation."

This specific instance of conduct directly probes the Defendant's propensity for untruthfulness as contemplated by F.R.E. 608(b).

### A. RULE 608(b) PERMITS CROSS-EXAMINATION ON DEFENDANT'S PROPENSITY FOR UNTRUTHFULNESS AS EVIDENCED IN NOVATON.

The defendant primarily challenges use of the Novaton decision on the basis of its remoteness, citing in support Anwar v. United States, 648 F.Supp 820, 829(N.D. N.Y 1986). The court in Anwar does compare the concept of "not remote in time" taken from the Advisory Committee notes to Rule 608 to Rule 609's ten year time limit for use of convictions. However, the district court's opinion is not in sync with its parent circuit. In United States v. Weichert, 783 F.2d 23 (2d Cir. 1986), the Second Circuit specifically rejected this analogy to Rule 609, stating instead that the district court is to

43

impose a Rule 403 balancing test. <u>Weichert</u>, 783 F.2d at 26. That is, does the evidence's probative value outweigh any prejudicial effort. <u>Id</u>. at 26. In <u>Weichert</u> the Circuit held that the district court properly allowed cross examination of the defendant as to his disbarment twelve years prior to trial.[5] <u>Id</u>. at 26. The Second Circuit noted that the passage of time is a factor to consider in weighing the evidence's value, not a restriction. <u>Id.</u>, at 25-26. See also, <u>United States v. Jackson</u>, 882 F.2d 1444 at 1447 (9th Cir. 1989) (upheld the use of a 14 year old disbarment to impeach a lawyer/defendant, again noting that remoteness is only a factor in determining the probative value of evidence).

The law is also clear that "Federal Rule of Evidence 608(b) allows a witness' credibility to be attacked based on misconduct that, while not constituting a criminal conviction, nevertheless tends to show that the witness is untruthful." <u>United States v. Whitmore</u>, 359 F.3d 609, 620 (D.C. Cir. 2004). In <u>Whitmore</u> the D.C. Circuit found that the district court erred by not allowing a defendant to cross examine an arresting officer regarding a prior court's adverse credibility finding. In so holding, the Circuit wrote, "We agree. Nothing could be more probative of a witness' character for truthfulness than evidence that a witness lied under oath." 359 F.3d

---

[5]The government notes that the Second Circuit, as do the other Court's cited hereafter, refers to the date of the finding of untruthfulness rather than the date of the underlying conduct. Rule 609, similarly, utilizes the date of convictions, not when the crime occurred. The <u>Novaton</u> decision was published in 2001.

at 619. See also, <u>United States v. Bagaric</u>, 706 F.2d 42, 65 (2d Cir. 1983), (negative credibility finding by an Immigration Judge); <u>United States v. Terry</u>, 702 F.2d 299, 316 (2d Cir. 1983) (finding that a D.C. Superior Court Judge had found that an expert "guessed" under oath); <u>United States vs. Davis</u>, 183 F.3d 231, 256 (3d Cir. 1999) (negative credibility by Transit Authority Police, Internal Affairs).

Wright and Golds' <u>Federal Practice and Procedure</u> at § 6118 (p94) lists several factors relevant to evaluating the degree of probative value of impeachment evidence. These include:

1. The importance of the witness' testimony;

2. The extent to which the evidence is probative of truthfulness or untruthfulness;

3. The extent to which the evidence is probative of other relevant matters;

4. The extent to which the circumstances surrounding the specific instances of conduct and similar to the circumstances surrounding the giving of the witness' testimony;

5. The nearness or remoteness of the instances to the trial; and

6. The likelihood that the specific instances in fact occurred.

The probative value of <u>Novaton</u> when evaluated under the case law and the above-listed factors, is clear and overpowering. The

45

Eleventh Circuit makes a specific finding that goes right to the heart of the Defendant's truthfulness. The government submits that the determination of the Eleventh Circuit should be given great deference. This is particularly so in light of the fact that the panel could have authored its opinion - having found the "error" by Lucas to be harmless - without addressing its credibility determination.

The significance of this specific instance of misconduct is patent. It involved a federal law enforcement agent, swearing, under oath, to an affidavit before a United States District Court Judge from whom he sought authorization to be permitted to conduct the most invasive forms of investigation authorized by law. The magnitude of the circumstance elevates the misconduct beyond that found in the other reported cases. Should the Defendant elect to testify, the jury will have the opportunity to weigh his credibility with that of other witnesses.

> B. THE COURT SHOULD NOT EXERCISE ITS DISCRETION TO APPLY THE DOCTRINE OF JUDICIAL ESTOPPEL

The Defendant's alternative ground for precluding use of the Novaton opinion relies upon the theory of judicial estoppel. The Defendant accurately sets forth the predicates for applying this doctrine: that a party's position is clearly inconsistent with one taken in a prior proceeding, whether said party was successful in having the court accept the prior position, and whether the party seeking the inconsistent position would derive an unfair advantage or impose a detriment to his opponent. See, New Hampshire v. Maine, 532

46

U.S. 742, 749 (2001).

The Sixth Circuit has had occasion to address this doctrine noting that the doctrine is designed to protect the judiciary from being victimized by making inconsistent rulings based upon a party's taking contrary positions at different phases of a case. See, Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598-599 (6th Cir. 1982), see also, Teledyne Industries Incorporated v. Nat'l Labor Relations Bd., 911 F.2d 1214, 1218-1219 (6th Cir. 1990).

The Supreme Court wrote in Zedner v. United States:

> "This Rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contrary argument to prevail in another phase."

Zedner v. United States: 547 U.S. 489, at 501 (2006). Several of the cases cited by the Defendant uphold this principle. See Allen v. Zurich Ins. Co., 667 F.2d 1162, 1168 (4th Cir. 1982) (a party may be precluded from adopting a position in conflict with one earlier taken in the same or related litigation.) Scarano v. Cent. Rail Co. of New Jersey, 203 F.2d 510 (3d Cir. 1993) ("with respect to the same matter in the same or a successive series of suits"). See also, Aston Chauffored Limosine v. Runnfeldt Inv. Corp., 910 F.2d 1540, 1548 (7th Cir. 1990).

The Sixth Circuit has held the doctrine applicable to the government; however, it has noted that the doctrine should be used "very reluctantly" and that the courts should "exercise special restraint" in applying it to the government. See Reynolds v. Comm'r of

47

Internal Revenue, 861 F.2d 469, 472 (6th Cir. 1988). See also, United States v. Owens, 54 F.3d 271, 275 (6th Cir. 1995) and Conforti v. United States, 74 F.3d 838, 841 (8th Cir. 1996) (estoppel will rarely be applied against the government.)

The Fifth and Eighth Circuits specifically acknowledged an unawareness of any case applying the doctrine against the government in a criminal matter. See, United States v. Grap, 368 F.3d 824, 830-31 (8th Cir. 2004); United States v. McCaskey, 9 F.3d 368, 384 (5th Cir. 1993) ("an obscure doctrine that has apparently never been applied against the government in a criminal proceeding.") As the Supreme Court of the United States stated in New Hampshire, "judicial estoppel is an equitable doctrine invoked by a court at its discretion" and "we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." See New Hampshire, 532 U.S. at 540. The government respectfully submits that the equities in the instant case compel the admissibility of the Novaton opinion for use in cross examination.


The burden to seek the estopping of the government is great, and, based upon our research, has never been held against the government in a criminal case. The government's motion, upon which the Defendant relies (Defendant's Example I), is a motion to the United States Magistrate Judges seeking permission to not disclose Novaton as Giglio material when the Defendant appeared before them. This motion

48

was granted. To the best of the government's knowledge, no District Court has ever ruled on the admissibility of <u>Novaton</u> to impeach Defendant Lucas under Rule 608(b). Therefore, the government has not prevailed on this issue in a prior proceeding - the second prong in the Supreme Court's test.

Additionally, unlike in the prior decisions upholding the doctrine, the instant case is not a "phase of" or "successor to" any of the cases in which the defendant served as a government witness. The government does not here seek an unfair advantage nor attempt to impose a detriment to the Defendant, but merely seeks a level playing field, wherein the Defendant, should he testify, is exposed to the same rigors as the other witnesses in the case. In the past, the government argued in good faith that <u>Novaton</u> should not be turned over as Giglio material; however, the facts now known to the government, have changed. The instant allegations that the Defendant will say anything to further a case cast a new light on the relevance and probity of <u>Novaton</u>.

49

IX.      <u>CONCLUSION</u>

For the reasons set forth herein, the government respectfully requests that this Honorable Court deny each of the pretrial motions filed by the Defendant.

Respectfully submitted,

<u>s/Bruce J. Teitelbaum</u>
BRUCE J. TEITELBAUM
Special Attorney to the Attorney General
PA ID No. 32266

<u>s/Michael A. Comber</u>
MICHAEL A. COMBER
Special Attorney to the Attorney General
PA ID No. 81951